UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIMONE PRYCE and DAVID PRYCE,<br><br>                              Plaintiffs,<br><br>                    -v.-<br><br>TOWN SPORTS INTERNATIONAL, LLC, d/b/a<br>New York Sports Club,<br><br>                              Defendant. | 18 Civ. 5863 (KPF)<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Simone Pryce ("Mrs. Pryce") and her husband David Pryce ("Mr. Pryce") brought this negligence action alleging that Mrs. Pryce sustained a shoulder injury while exercising with personal trainer Jonathan Reyes ("Reyes"), on July 2, 2015, at a gym owned by Defendant Town Sports International, LLC, d/b/a New York Sports Club ("NYSC"). Specifically, Plaintiffs allege that Reyes briefly left Mrs. Pryce unsupervised while she was performing an exercise with a medicine ball and thereby breached a duty to ensure a safe and controlled exercise environment, which breach proximately caused Mrs. Pryce's injury. The Court conducted a bench trial in this matter between February 3, 2020, and February 6, 2020. In this Opinion, the Court presents its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

The Court has carefully reviewed the transcript of the trial, the trial exhibits, and the parties' post-trial submissions and has considered those materials in light of its own recollections of the trial and its perception of the

credibility of the witnesses who testified.  While the Court largely credits Mrs. Pryce's testimony as to what happened at her July 2, 2015 personal training session with Reyes, it nonetheless finds that Mrs. Pryce has failed to meet her burden of proof.  Accordingly, the Court concludes that Mrs. Pryce is not entitled to relief on her negligence claim, and that Mr. Pryce is similarly not entitled to relief on his *per quod* claim.

## PROCEDURAL BACKGROUND

This action was initiated by the filing of a complaint by Plaintiffs on June 28, 2018.  (Dkt. #1).  The complaint named as defendants, New York Sports Club, New York Sports Club, Inc., Town Sports International, LLC, Town Sports International, L.L.C., Town Sports International, Inc., TSI East 41, LLC, Town Sports International Holdings, TSI Holdings, Town Sports International Holdings, Inc. (collectively, "Defendants"),[1] John Does 1-20, ABC Corporations 1-20, and Jonathan Reyes.  (*Id.*).  Defendants filed an answer to the complaint on October 18, 2018.  (Dkt. #38).  The Court entered a case management plan on October 19, 2018.  (Dkt. #42).

The Court held a pretrial conference on March 4, 2019, at which time the parties indicated that they would not be filing summary judgment motions. (*See* Minute Entry for 3/4/2019; Dkt. #72 (transcript)).  The Court held a telephone conference on April 11, 2019, to discuss setting a trial date.  (*See* Minute Entry for 4/11/2019).  Then, on April 26, 2019, the Court entered a

---

[1]      References to "Defendant" in the singular are to NYSC, the defendant at trial.

pretrial order that scheduled the trial to begin on February 3, 2020. (Dkt. #50). The parties filed their pretrial order, motions *in limine*, proposed voir dire questions, proposed jury instructions, and pretrial memoranda in January and February 2020. (*See* Dkt. #52-54, 56-58, 60-61, 64-65).

The Court held the final pretrial conference on January 21, 2020. (*See* Dkt. #78 (transcript)). At the pretrial conference, the Court and the parties streamlined the issues for trial in several ways: (i) the Court resolved many of the evidentiary issues raised by the parties' motions *in limine* (*see generally id.*); (ii) Plaintiffs dropped their claims for failure to supervise, negligent supervision, and violation of New York General Business Law § 349 and stated that Mrs. Pryce would proceed only on her negligence claim and Mr. Pryce would proceed only on his loss of consortium claim (*see id.* at 4, 32-33, 60); (iii) the parties notified the Court that they might consent to a bench trial (*see id.* at 57-58); (iv) Plaintiffs stipulated to revising the case caption to reflect Town Sports International, LLC as the only defendant at trial (*see id.* at 58-59); and (v) Defendants consented to stipulating to *respondeat superior* liability for Reyes's actions acting within the scope of his employment (*see id.* at 59). The next day, January 22, 2020, the Court entered an order confirming that the trial would proceed as a bench trial, and that the case caption should be amended. (Dkt. #66).

The case proceeded to trial over the course of four days, from February 3, 2020, to February 6, 2020. (*See* Dkt. #80-81, 88-89 (trial transcript)). The Court heard testimony from three fact witnesses and three expert witnesses

and admitted several exhibits into evidence.  (*See id.*).  In lieu of closing arguments, the parties submitted proposed findings of fact and conclusions of law (Dkt. #84, 85), as well as rebuttal briefs (Dkt. #86, 87).  The parties also submitted legal memoranda immediately following the bench trial.  (Dkt. # 74-75).

On September 14, 2020, NYSC filed a notice of bankruptcy, in which it advised the Court and Plaintiffs that Town Sports International, LLC and several of its affiliates had filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  (Dkt. #90).  As a result, the Court endorsed the notice and stayed the proceedings in this case pending further order of the Court.  (Dkt. #91).  Plaintiffs then responded with a letter dated September 18, 2020, outlining their contemplated motion to lift or modify the stay.  (Dkt. #92).  By letter dated March 12, 2021, Plaintiffs advised the Court that the bankruptcy court had entered an order approving a stipulation that granted Plaintiffs limited relief from the stay; in pertinent part, the order permitted the parties to continue this litigation through "trial, judgment, settlement, enforcement, and/or appeal."  (Dkt. #93 at Ex. A).  Accordingly, the Court will restore the case to the Court's active docket by separate order, and will now issue its findings of fact and conclusions of law.

**FINDINGS OF FACT**[2]

**A.    The Fact Witness Testimony**

At trial, the Court heard testimony from three fact witnesses: Mrs. Pryce, Mr. Pryce, and Jonathan Reyes.  The Court found Mrs. Pryce to be generally credible with respect to the incident at NYSC and her resulting injuries.  The Court here employs the qualifier "generally" because Mrs. Pryce's testimony did contain several inconsistencies, both as presented at trial and as compared to her deposition testimony.  Among other things, Mrs. Pryce was inconsistent regarding the precise position of her body when performing the exercise during which she claims to have been injured; she frequently confused her left and right sides; and she had difficulty recalling the equipment that she used, including whether she was using a kettlebell or a medicine ball on the day of the incident.  Mrs. Pryce also reviewed her prior deposition testimony on the evening between her first and second days of testimony.  (Tr. 533:20-534:25).  However, on the issues that mattered, the Court found Mrs. Pryce more credible than Reyes, whose testimony was less consistent and, ultimately, less plausible in light of the other evidence at trial.  The Court also found Mr. Pryce to be credible, although the subjects as to which he had firsthand knowledge were necessarily limited.

---

[2]    The Court relied on several documents in drafting this Opinion, including the transcript of the trial ("Tr." (Dkt. #80-81, 88-89)) and the exhibits that Plaintiffs ("Pl. Ex.") and Defendant ("Def. Ex.") introduced during the trial; Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl. FFCL" (Dkt. #85)); Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. FFCL" (Dkt. #84)); Plaintiffs' Response to Defendant's Proposed Findings of Fact and Conclusions of Law ("Pl. Resp." (Dkt. #87)); and Defendant's Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Def. Resp." (Dkt. #86)).

### 1.    Mrs. Pryce Joins NYSC

Mrs. Pryce is from Astoria, Queens, and is in her mid-50s. (Tr. 340:3-4, 344:13). Mrs. Pryce has had a long career at Crain's Publishing, where, at the time of trial, she was a production director. (*Id.* at 340:9-12, 340:20-341:1). She is paid a weekly salary of $1,500 and bonus of around $12,000. (*Id.* at 341:23-342:1, 410:17-18, 412:9-413:16). At the time of trial, Mrs. Pryce had been married to Mr. Pryce for 13 years. (*Id.* at 594:18-23). Mr. and Mrs. Pryce maintain an active lifestyle and share many interests and hobbies, including swimming, basketball, tennis, hiking, and cycling. (*Id.* at 595:9-24).

On March 2, 2015, Mrs. Pryce attempted to take advantage of a discount offered by Crain's for a membership at the NYSC facility on 41st Street and 3rd Avenue in Manhattan, which was near her office. (Tr. 286:7-9, 344:11-12, 427:24-428:4).[3] Mrs. Pryce had turned 51 around this time and joined the gym in order to gain muscle mass and strength. (*Id.* at 344:12-16). Section 3.5 of the membership agreement she signed at NYSC, entitled "Activity Risk," states:

> Any strenuous athletic or physical activity involves certain risks. By signing this agreement, you represent that you understand and you acknowledge that there are certain risks associated with the use of a health club and the use of fitness equipment, and that free weights pose a risk of injury if not used correctly. We cannot guarantee that any facility or equipment is free of risk. You agree to use care in the use of the club's facility,

---

[3]    Mrs. Pryce signed the NYSC membership agreement on a keypad and claimed not to have read the agreement before she signed it. (Tr. 431:1-432:12). Though she was later given a copy of the signed agreement, Mrs. Pryce elected not to read it, even as of the time of trial. (*Id.* at 433:2-16).

> equipment, and services and to protect against
> accidents by other members.

(*Id.* at 433:22-434:10; *see* Def. Ex. 3).

When she first joined NYSC, Mrs. Pryce would use the elliptical machine two or three times per week. (Tr. 344:16-18). Shortly thereafter, she decided to sign up for personal training sessions. (*Id.* at 344:18-25). She hoped that personal training would help her gain strength and learn how to use weights. (*Id.* at 344:18-21, 346:4-6).

### 2. Mrs. Pryce's Personal Training with Jonathan Reyes

Mrs. Pryce spoke to the receptionist at NYSC about her interest in personal training; the receptionist then set her up with an appointment with NYSC personal trainer Jonathan Reyes, who was certified by the International Sports Science Association. (Tr. at 144:3-7, 147:5-9, 346:7-23).[4] Reyes had worked for NYSC since June 2009 as a personal trainer. (*Id.* at 251:4-6).[5] At their introductory session, Reyes conducted an "initial assessment" of Mrs. Pryce in his office. (*Id.* at 347:12-14, 162:4-8). During the evaluation, Reyes asked her questions about her health history, lifestyle habits, and goals. (*Id.* at

---

[4]    Rather than present expert testimony regarding standards and practices for personal trainers, Plaintiffs sought to introduce such concepts through their counsel's questioning of Reyes. The Court has largely discounted these efforts, in part because they exist in tension with Plaintiffs' argument that the Court should discredit Reyes's testimony, and in part because Reyes was imprecise in his answers — not aware, for example, of certain standards or texts on which he was questioned.

[5]    Reyes started out as a floor trainer and was subsequently promoted to an apprentice trainer, a pro trainer, a master trainer, and finally a fitness manager. (Tr. 252:6-10). His current position is fitness manager. (*Id.* at 251:10-11). During his tenure at NYSC, Reyes has always worked at the NYSC location on 41st Street and 3rd Avenue in Manhattan. (*Id.* at 253:7-13). In the course of his career, he has trained hundreds of clients and given thousands of personal training sessions. (*Id.* at 268:8-269:4).

348:5-349:4, 162:5-8, 271:1-16).[6]  Mrs. Pryce told Reyes that she is diabetic

and that she had a lateral meniscus tear,[7] and they discussed her diet and her

desire to get stronger.[8]  (*Id.* at 348:11-349:4).  After the evaluation, Mrs. Pryce

signed up for a package of 12 personal training sessions.  (*Id.* at 211:1-5,

353:5-7; *see also id.* at 283:25-284:8).

Reyes developed a fitness program for Mrs. Pryce.  (Tr. 284:9-10).  At

first, the training consisted of mostly bodyweight training, but as it evolved,

Reyes began incorporating light weights.  (*Id.* at 284:12-285:11).  In her later

personal training sessions, Mrs. Pryce advanced to using stationary machines,

7.5-pound dumbbells, and an 8-pound medicine ball with handles.  (*Id.* at

178:17-25, 285:8-20).[9]  While Mrs. Pryce would usually warm up on her own

before their training sessions, during their training sessions, Reyes would

---

[6]    NYSC disposed of Mrs. Pryce's evaluation form and client folder in a routine cleanout of its office in or about 2016 or 2017.  (Tr. 278:18-279:14, 318:21-322:13).

[7]    Reyes told Mrs. Pryce that he would note her meniscus tear on some of the exercises they would do.  (Tr. 350:6-9).

[8]    One area of dispute concerns whether Mrs. Pryce had a prior shoulder injury, and, if so, whether she disclosed this information to Reyes.  Mrs. Pryce testified that, during the evaluation with Reyes, she did not mention any issues regarding her shoulder or numbness in her arm because she had no such issues.  (Tr. 354:2-8).  Reyes, however, recalled that, during the initial assessment, Mrs. Pryce informed him that she had a "shoulder issue" and "some knee issues."  (*Id.* at 162:24-163:8).  Specifically, he stated that Mrs. Pryce told him that her right shoulder would give her "some type of numbness down the arm," and he explained that because of her limited range of motion he would not have had her perform an exercise where she reached above her head.  (*Id.* at 163:9-13, 292:14-293:8).  The Court found Mrs. Pryce's testimony on this point more credible. In particular, the Court found credible Mrs. Pryce's testimony that, while training under Reyes's supervision, she had performed an exercise using a machine in which she reached over her head and pulled down on a bar by which she was able to pull herself (and a platform) up.  (*Id.* at 457:12-458:21, 577:15-587:21).

[9]    Throughout her deposition, Mrs. Pryce had repeatedly referred to the piece of equipment that she used during her July 2, 2015 training session as a kettlebell.  (*See* Tr. 533:23-534:8 (discussing deposition testimony)).  At trial, Mrs. Pryce disclaimed ever using a kettlebell during her personal training, and instead indicated that the equipment was a medicine ball.  (*Id.* at 288:21-23, 372:19-25, 444:8-16, 572:16-21).

stand next to Mrs. Pryce, show her how to do the exercises, correct her technique and posture, and guide her as she was performing the exercises.  (*Id*. at 174:6-8, 287:17-23, 566:12-24).

### 3.   Mrs. Pryce's Final Personal Training Session

Mrs. Pryce's final training session with Reyes occurred on July 2, 2015, at around 7:00 a.m.  (Tr. 354:9-16).  On that day, she arrived at NYSC from her home, exercised for 30 minutes on the elliptical, and then checked in with Reyes via text message to let him know that she was ready for their session. (*Id*. at 357:3-11).  They had developed a routine by which Reyes would tell Mrs. Pryce the exercises they would do and the machines they would use.  (*Id*. at 357:22-25).

About halfway through the session, Reyes demonstrated an exercise for Mrs. Pryce that the parties have referred to as a "core diagonal crossover." (*See, e.g.*, Tr. 176:2-5).  This particular exercise was the subject of much discussion during the trial.  Reyes testified that there were several versions of the exercise.  (*Id*. at 176:16-19).  At trial, both Reyes and Mrs. Pryce demonstrated, using a lightweight yoga ball, the particular version of the exercise that Reyes recalled teaching and that Mrs. Pryce recalled learning; the witnesses' recollections of the movement of the arms and torso were substantively identical, but their recollections of leg placement differed.  When Mrs. Pryce demonstrated the exercise in court, she put her right knee on the ground, bent her left knee, held the ball out in front of her chest with slightly bent arms, and then moved it over towards her right shoulder to about ear-

level before returning it in front of her chest.  (*Id.* at 360:1-362:3; *see also id.* at 504:15-20, 506:14-18).  The motion was slow and steady.  The Court understood that, in practice, when a set of 10 repetitions of the exercise was completed, Mrs. Pryce would switch leg positions and move the ball in a similar fashion towards the other shoulder.  (*Id.* at 360:17-22, 367:9-16).  When Reyes demonstrated the exercise in court, he stood while holding the ball at approximately belly level and then moved his arms to approximately chin level; his motion was similarly slow and steady.  (*Id.* at 182:2-14).  Reyes acknowledged that the exercise could be performed with one knee on the ground (*id.* at 183:19-184:11), but recalled instructing Mrs. Pryce to perform the exercise in an "isolation lunge" position, with one knee bent and lowered but not touching the ground (*id.* at 185:15-187:5).

The parties agree that Reyes first demonstrated the core diagonal crossover exercise to Mrs. Pryce before she ever performed it.  (*See, e.g.*, Tr. 192:4-25; *id.* at 193:5-10 (Reyes agreeing that as to each new exercise, "the first person to do it was you and then [Mrs. Pryce] mirrored what she saw you do?"); *id.* at 301:22-302:9 (same); *id.* at 359:6-12 (Mrs. Pryce recalling that Reyes "showed [her] what to do"); *id.* at 368:5-6 (same); *id.* at 456:8-15 (Mrs. Pryce acknowledging that Reyes would "show [her] exactly how to do that exercise before he would allow [her] to perform it")).[10]  And when she performed

---

[10]     The parties dispute, however, whether Reyes had instructed Mrs. Pryce on any variant of the core diagonal crossover exercise in any training session prior to July 2, 2015. (*Compare, e.g.*, Tr. 185:15-187:16 (Reyes discussing "progress[ing]" with Mrs. Pryce to more challenging versions of the core diagonal crossover exercise over a period of

the exercise, Mrs. Pryce strove to replicate the form and technique that Reyes had demonstrated for her.  (*Id.* at 568:17-19).  Mrs. Pryce could not recall the specific weight of the medicine ball that she was holding on July 2, 2015 (*see id.* at 365:10-13), but Reyes recalled that she had progressed to using an 8-pound medicine ball (*id.* at 178:24-25, 188:14-16).  Mrs. Pryce recalled that on July 2, 2015, Reyes stood within three feet of her when she began the exercise in order to observe (and, as necessary, correct) her form.  (*Id.* at 368:5-6, 510:11-13).  However, at some point when she was performing the exercise, Reyes walked approximately 12 feet away from Mrs. Pryce to talk to a patron at the gym.  (*Id.* at 368:7-14).  While he was speaking with the patron, Reyes had his back to Mrs. Pryce.  (*Id.* at 369:1-25).

Mrs. Pryce completed two sets of ten repetitions on her left side before switching to the right side; she performed two or three repetitions on the right side when she felt a pull in her shoulder.  (Tr. 367:9-20, 502:22-503:8, 506:19-22).  When Mrs. Pryce felt the pull, she did not call out to Reyes; she stopped the exercise, put the medicine ball down, and waited for Reyes to come back to tell him she was having a hard time.  (*Id.* at 370:7-10).  Reyes told her they would end the session for the day, and he brought her to the table outside of his office and stretched her out.  (*Id.* at 370:23-371:14).[11]

---

weeks); *id.* at 195:8-10 (same), *with id.* at 362:8-363:1 (Mrs. Pryce recalling the July 2, 2015 training session as "our first time doing" the core diagonal crossover, and not recalling performing other progressions of the exercise to which Reyes testified)).  The Court will accept Mrs. Pryce's recollection.

[11]   Reyes did not recall a training session with Mrs. Pryce that ended early because of claimed injury (Tr. 293:9-20), nor did he recall ever stretching her out (*id.* at 297:17-19).

After her session, Mrs. Pryce went to her office, showered, got dressed and started her day.  (Tr. 373:12-18).  She began to feel sore after the session and the ache continued through the evening.  (Tr. 373:16-20).  She told her husband that she hurt her shoulder at the gym while performing an exercise where she raised a ball over her head.  (*Id.* at 375:19-25, 602:2-5).[12]  Mr. Pryce was upset and confused upon learning that Mrs. Pryce was injured.  (*Id.* at 601:7-17).  He told her to take a shower and relax.  (*Id.* at 375:23-24).

Mrs. Pryce initially viewed her pain as akin to the usual soreness she experienced after training sessions, and particularly after trying new exercises.  (Tr. 373:16-22).  However, when she went to sleep that night, the symptoms persisted.  (*Id.* at 373:22-25).  She boosted herself up on pillows but still tossed and turned during the night.  (*Id.* at 373:25-374:1).  Mrs. Pryce was off from work for the next few days for the July 4th holiday, and she relaxed at home.  (*Id.* at 374:2-12, 388:5-16).  However, the soreness did not wear off and she felt as though she was not getting any better.  (*Id.* at 374:12-14).

### 4.    Mrs. Pryce's Shoulder Treatment

Approximately twelve days after the July 2, 2015 training session, Mrs. Pryce visited her primary care doctor.  (Tr. 389:3-6, 518:19-520:2).  Her primary care physician referred her to an orthopedist, Dr. Rizzo, who sent her for an MRI.  (*Id.* at 389:9-18).[13]  Mrs. Pryce met with Dr. Rizzo on July 17,

---

[12]    Mrs. Pryce testified that she also told her sister that she injured her shoulder at the gym.  (Tr. 376:4-6).

[13]    Dr. Rizzo's records from his first appointment with Mrs. Pryce, on July 14, 2015, reflect that Mrs. Pryce told him that she sustained the shoulder injury six weeks prior, which

2015, after he received the results from her MRI. (*Id.* at 389:11-12, 737:1-5).
He told her that she had a bicep tear and that her rotator cuff needed to be
repaired. (*Id.* at 389:23-24). Dr. Rizzo explained to Mrs. Pryce that while some
people could heal with physical therapy, he believed that physical therapy
would not help her, and that she would likely need surgery eventually. (*Id.* at
389:24-390:15).

Mrs. Pryce decided to go forward with surgery on July 29, 2015, because
she was in constant pain. (Tr. 390:1-391:9). Following the surgery, Mrs. Pryce
had to keep her arm in a sling. (*Id.* at 394:4-5). About two weeks after the
surgery, Mrs. Pryce began a physical therapy regimen, including doing
exercises at home, to try to rehabilitate her shoulder. (*Id.* at 395:3-13).
However, for a period after beginning physical therapy, she remained unable to
use her right hand and to perform routine tasks like washing her hair, getting
dressed, or cooking. (*Id.* at 395:14-25).[14] Since she was unable to exercise
and be active, Mrs. Pryce gained approximately 50 lbs. during her recovery.
(*Id.* at 397:9-14). She also had to begin taking insulin for the first time in six
years to control her diabetes. (*Id.* at 397:15-398:4).

Around the time Mrs. Pryce began physical therapy, she noticed that her
right hand had become swollen and painful. (Tr. 398:17-22). Her physical

---

would mean that she became injured around June 2, 2015. (*See* Def. Ex. 1). Mrs.
Pryce denied that she told Dr. Rizzo her injury had occurred six weeks prior to their
visit. (Tr. 526:16-18).

[14]    As result of Mrs. Pryce's injury, Mr. Pryce had to take on additional household
responsibilities. (Tr. 603:3-604:2). He also drove her to her many doctor's
appointments, which caused him to take approximately three months off from his job
as an Uber driver. (*Id.* at 605:21-607:23).

therapist suggested she see a doctor, so she made another appointment with her orthopedist, Dr. Rizzo. (*Id.* at 398:23-399:2). She explained to Dr. Rizzo that her hand was always swollen, she could not open or move it, and she was experiencing a burning feeling. (*Id.* at 399:4-6). Dr. Rizzo referred Mrs. Pryce to a hand specialist in his office, Dr. Sandeep Rathi. (*Id.* at 399:6-7, 536:8-537:11).

Dr. Rathi prescribed Mrs. Pryce a nerve medication, Lyrica, which she took once a day. (Tr. 399:19-400:1). However, the medication did not help: her hand remained swollen and numb. (*Id.* at 399:23-400:12). Mrs. Pryce was told she would need to have a ganglion block every other week for several weeks, which procedure was intended to address her nerve pain. (*Id.* at 400:9-17). Following this advice, she had three ganglion block procedures performed. (*Id.* at 400:18-19). She felt no relief after the first two procedures, but after the third one her swelling started to go down and she experienced relief. (*Id.* at 400:20-401:4). From that point forward, she experienced no further limitations on the use of her right hand. (*Id.* at 401:5-12).[15]

Even after completing physical therapy, Mrs. Pryce still had issues with her right shoulder: she experienced twinges, had difficulty putting on clothes and washing her hair, and occasionally felt aches and pains. (Tr. 402:1-5, 403:17-24). While her shoulder mobility improved with physical therapy, by the time of trial it had not returned to where it was prior to her injury. (*Id.* at

---

[15]   Mrs. Pryce testified that she occasionally experiences a burning sensation in the center of her hand that causes a pain to shoot up her arm for around 30 seconds, but other than that her hand has recovered. (Tr. 401:5-25).

14

402:9-403:5).  Because of her shoulder issues, she no longer takes part in certain activities that she enjoys, including playing tennis, biking, hiking, and swimming.  (*Id.* at 404:4-408:5, 611:2-14).

Following Mrs. Pryce's surgery, she missed approximately 10 weeks of work.  (Tr. 408:23-409:7).  She received 80% of her income through disability insurance but lost $3,000 in salary during this time.  (*Id.* at 410:21-411:14).  Her bonus was also around $6,000 lower in 2015 than it had been in prior years.  (*Id.* at 412:5-413:18).[16]  In addition to her lost income, Mrs. Pryce incurred approximately $6,000 in out-of-pocket medical expenses, which consisted of co-pays for medical treatment and physical therapy.  (*Id.* at 420:7-12).  Mr. Pryce also lost income because he stopped working for several months after Mrs. Pryce's injury so that he could drive her to her doctor's appointments and care for her as necessary.  (*Id.* at 605:21-607:23).

## B.    The Expert Witness Testimony

The parties proffered competing expert witnesses at trial.  In broad strokes, Plaintiffs' expert, Dr. Sharef Hassan, testified that Mrs. Pryce could have sustained her shoulder injury through an overhead exercise; NYSC's expert, Dr. Andrew Bazos, testified that Mrs. Pryce's shoulder injuries were not caused by an isolated event.  While the Court found both expert witnesses to

---

[16]    Mrs. Pryce also testified that she missed a bonus of around $20,000 to $40,000, which she would have received were she able to lead a project to roll out a new editorial system at Crain's.  (Tr. 414:23-416:11).  She did not, however, have any documents or paperwork to reflect this potential bonus opportunity (*id.* at 540:8-16), and the Court finds her claim to this missed bonus to be unduly speculative.

be credible, it found Dr. Bazos's explanation of Mrs. Pryce's injuries to be better supported by the evidence at trial.  The Court summarizes the expert testimony below.[17]

### 1.    Dr. Sharef Hassan

Plaintiffs proffered the testimony of Dr. Sharef Hassan, a qualified expert in the field of orthopedics.[18]  Dr. Hassan is board certified in orthopedic surgery and presently practices at Landa Spine and Orthopedic Medicine in New Jersey.  (Tr. 21:22-23, 24:8-23).  He spends around 95% of his time as a practicing physician: he typically sees patients four to five days per week and performs surgery at least one to two days per week.  (*Id.* at 22:24-23:2).  Dr. Hassan spends the other 5% of his time doing forensic medicine.  (*Id.* at 23:2-4).  He specializes in shoulders and knees and frequently performs surgery, including arthroscopic shoulder surgery.  (*Id.* at 22:14-19, 23:8-24:2).[19]

Dr. Hassan was not Mrs. Pryce's treating physician.  (Tr. 28:2-4).  However, he met with Mrs. Pryce; reviewed Mrs. Pryce's medical records from

---

[17]    The Court presents this testimony in the interest of completeness.  However, given the Court's finding that Plaintiffs have not proven Mrs. Pryce's claim of negligence, the testimony is largely irrelevant to the Court's analysis.

[18]    Dr. Hassan is a graduate of Columbia University and Albert Einstein Medical College, from which he has an M.D. and at which he completed his residency in orthopedics.  (Tr. 21:12-23).  He completed a fellowship in arthroscopic surgery in sports medicine at Union Memorial Hospital in Baltimore.  (*Id.*).  For a time, he was on the faculty at Mount Sinai Medical Center.  (*Id.*).  He is currently a volunteer teaching attendant at Mount Sinai Hospital.  (*Id.* at 22:11-12).  Dr. Hassan is also a member of the American Academy of Orthopedic Surgery, the Arthroscopy Association of North America, and the American Orthopedic Society of Sports Medicine.  (*Id.* at 24:3-9).

[19]    Dr. Hassan told the Court that he has testified in court on two prior occasions and conducted two video depositions on behalf of Plaintiffs' counsel, the Clark Law Firm, in different cases.  (Tr. 86:1-87:17).

Sports Training Physical Therapy, Shore Orthopedic Group, and the operative report from Dr. Rizzo;[20] viewed the MRI films of her right shoulder taken on July 15, 2015; reviewed the medical records and bill for her surgery from Lakewood Surgery Center; obtained a history from Mrs. Pryce involving the injury to her right shoulder; and performed a physical examination of Mrs. Pryce focusing on her shoulder.[21]  (*Id.* at 26:10-28:8).  He also reviewed the independent medical examinations from the two defense experts, Dr. Bazos and Dr. Weiland.  (*Id.* at 27:4-7).

Dr. Hassan testified that he always reviews the MRI films for his own patients and would not operate on a patient without first reviewing the films himself.  (Tr. 27:8-18).  He does not rely on radiology reports because, in his own review of the MRI films, he might identify issues relevant to surgical planning that a radiologist would not focus on (*id.* at 27:20-28:1).

Dr. Hassan explained that, based on his review of the medical records, his evaluation of Mrs. Pryce, and his review of the MRI films, he believed it more likely than not that Mrs. Pryce's initial shoulder injury was caused by her exercise.  (Tr. 28:9-13, 60:13-61:1, 62:6-19).  Specifically, he explained that:

> According to my reports and history, on the date in question, on July 2nd of 2015, she reported that she was exercising with a personal trainer.  I have in my records a kettle bell.  I believe it was some sort of exercise ball.  She said that during that time she was

---

[20]   An operative report is a report that summarizes what was encountered during a surgery and details how the surgery was performed.  (Tr. 41:23-25).

[21]   On cross-examination, Dr. Hassan was questioned about why he did not review the radiology report interpreting the MRI films.  (Tr. 93:15-94:19).  He explained that in his clinical practice he relies mostly on his own interpretation of the MRI films, such that the radiology report is less critical.  (*Id.* at 94:7-15).

> doing a maneuver and experienced a sharp — sudden
> sharp pain in her right shoulder while her trainer was
> distracted.  She then reported she could not continue
> her workout and needed to stop.

(*Id.* at 28:15-22).  He explained that if Mrs. Pryce had injured her rotator cuff

prior to the gym incident, she likely would have struggled with exercising or

experienced other difficulties with her shoulder.  (*Id.* at 61:10-18, 62:10:15).

Dr. Hassan explained that, despite different ways to grip a medicine ball,

the grip would "not necessarily have a tremendous impact on the shoulder

injury as much as more of a wrist or an elbow." (Tr. 29:20-22).  He stated that

"[t]he way the shoulder is being swung or the mechanism of how the shoulder

is moved with any sort of weight is more of a factor in terms of mechanism of

injury[.]" (*Id.* at 29:22-25).  In response to further inquiry, Dr. Hassan

explained:

> [A]s long as there is an overhead mechanism involved,
> that movement up and back down or rotating the
> shoulder outwards is really the most important concept
> behind an injury pattern like this.  What you are holding
> at the time could be irrelevant.  We see these injuries
> also with baseballs, which have very little weight, but it
> is the mechanism of bringing the arm back awkwardly
> or in an unexpected manner which causes injury itself.

(*Id.* at. at 30:12-19).[22]

Dr. Hassan also explained to the Court what he saw in the MRI films of

Mrs. Pryce's shoulder.  (*See* Tr. 34:22-37:13).  He testified that he observed a

---

[22]   Dr. Hassan also explained that in evaluating Mrs. Pryce, he considered that a trainer's
distraction could lead to injury because if the person exercising is not being watched by
their trainer, they could have "potentially poor form, potentially awkward mechanics."
(Tr. 31:3-23).

partial rotator cuff tear and a superior labrum (or "SLAP") tear, which were apparent from the gray discoloration in the tendon, a sign of fluid entering through the tendon. (*Id.* at 35:11-36:13). Dr. Hassan was also able to observe in the MRI images that Mrs. Pryce's shoulder joint was inflamed. (*Id.* at 36:13-37:1). Dr. Hassan referred to Mrs. Pryce's injury as a Type 3 or "bucket handle" tear. (*Id.* at 37:3-13).

Dr. Hassan explained that, typically, a Type 3 labral tear or a "bucket handle" tear occurs due to a traumatic event. (Tr. 37:19-21). He noted that "even if [Mrs. Pryce] had a little bit of degeneration or weakened labrum it takes an event, it takes torque or a sudden force on the part of the labrum to create that buck[et] handle, that SLAP tear." (*Id.* at 37:23-38:1). The tear he saw in the MRI films would not happen from "normal day-to-day use," but would usually take "abnormal force, not a regular day-to-day event." (*Id.* at 38:2-5). Dr. Hassan explained that the most common mechanisms causing a Type 3 SLAP tear are overhead exercises and throwing. (*Id.* at 39:7-12).[23]

Dr. Hassan also opined on Mrs. Pryce's course of treatment following her injury, and the surgery that took place roughly a month after her injury. (Tr. 39:13-40:13). He explained that he is among those surgeons who believe that

> if you identify or suspect a traumatic injury of the sort
> and the person is a good candidate for it, meaning
> they're going to utilize or reap the benefits of the

---

[23]   Dr. Hassan also testified that Mrs. Pryce had a Type 2 acromion, which is a genetic condition that presents as curved or downward-dipping. (Tr. 97:19-98:5). A Type 2 acromion is the most common type of acromion and is a risk factor for shoulder impingement syndrome in rotator cuff tears. (*Id.* at 98:8-99:22).

> surgery; they're active, they're not a sedentary person,
> it is causing dysfunction and symptoms in them and
> they desire to resume a similar activity level, that would
> be a good candidate to expedite or move forward
> quickly.

(*Id.* at 40:1-8). From reviewing the operative report, Dr. Hassan was able to identify that "during her right shoulder arthroscopy she had a repair of her rotator cuff tear. She had a subacromial decompression and acromioplasty, she had debridement of both her labral and biceps tendon tears, and a synovectomy was also performed." (*Id.* at 40:16-20). He explained to the Court, in detail, how the surgery took place, and what a patient could expect during the recovery period. (*Id.* at 42:1-45:23, 46:5-18).

Dr. Hassan also noted that Mrs. Pryce started going to physical therapy after her surgery, which is when she began to develop Complex Regional Pain Syndrome ("CRPS"). (Tr. 47:3-7). Dr. Hassan explained that CRPS is difficult to diagnose and there is a good deal of variability in treatment for CRPS. (*Id.* at 47:10-20). In his opinion, the best course of treatment is a pain modulator medication, aggressive therapy to prevent soft tissue contraction or loss of function, and constant monitoring. (*Id.* at 47:21-48:6). Dr. Hassan opined that Mrs. Pryce's CRPS was caused by either her initial trauma or her surgery. (*Id.* at 48:23-49:2, 60:20-24).

Dr. Hassan also testified about the examination he conducted of Mrs. Pryce. (Tr. 50:19-51:7). He explained that there was asymmetry in her supraspinatus muscles (the muscles on the back of the shoulder blade), which indicated to him that she may have had a loss of function in the muscle group

on the right side; an inability to properly use the muscle group; or an ongoing problem such as a continued tear. (*Id.* at 51:5-18). He explained that it is very common, after a rotator cuff injury and surgery, to have residual atrophy, meaning that the muscle has not fully healed. (*Id.* at 52:6-18). Dr. Hassan also observed that Mrs. Pryce had reduced range of motion (*id.* at 53:1-54:1), and some ongoing impingement (*id.* at 53:11-54:15).

Dr. Hassan explained that, given that Mrs. Pryce had residual symptoms three years after her surgery, a full recovery was unlikely. (Tr. 63:11-16; *see also id.* at 63:16-25). Moreover, Dr. Hassan considered it likely that Mrs. Pryce would require further medical treatment. (Tr. 64:4-19). He explained that if she experiences further degenerative changes over time, she may be a candidate for further surgery. (*Id.* at 64:19-25). Even if Mrs. Pryce did not need further surgery, Dr. Hassan believed that she would at least need occasional medications and cortisone injections going forward. (*Id.* at 65:15-18).

### 2.   Dr. Andrew Bazos

At trial, the Court accepted Dr. Bazos as an expert in the field of orthopedic surgery. (Tr. 693:22-694:5).[24] Dr. Bazos maintains a general orthopedic practice with a subspecialty in sports medicine. (*Id.* at 695:18-20).

---

[24]   Dr. Bazos is a graduate of Harvard College and Yale University School of Medicine. (Tr. 694:25-695:2). He did his residency in orthopedics at Columbia University and then did a fellowship in shoulder and knee surgery and sports medicine at NYU Hospital for Joint Diseases. (*Id.* at 695:6-10). He is board certified in orthopedic surgery. (*Id.* at 695:11-14).

Approximately 90% of his practice involves seeing and treating patients with orthopedic injuries.  (*Id.* at 696:1-7).[25]  He focuses on knee and shoulder surgery.  (*Id.* at 695:22-25).  Dr. Bazos estimated that he has performed approximately 5,000 arthroscopic procedures on shoulders.  (*Id.* at 696:20-23).

Dr. Bazos explained that an orthopedic surgery evaluation would consist of: (i) finding out what happened to the patient; (ii) conducting an examination focused on the bones, muscles, nerves, ligaments, and tendons; and (iii) explaining in lay terms the nature of the injury and treatment.  (Tr. 698:13-20).  He also explained that, when performing an orthopedic evaluation, he reviews the patient's records; talks to the patient about their history and course of treatment; listens to the patient's complaints; and discusses the patient's current level of function.  (*Id.* at 699:1-14).

Dr. Bazos examined Mrs. Pryce on March 28, 2019, at his office in Manhattan.  (Tr. 698:21-25).  He took her history and was advised that she injured her right shoulder doing an exercise at the gym.  (*Id.* at 699:15-22).  He found it significant that Mrs. Pryce did not seek immediate medical attention after the event that she claimed caused her injury.  (*Id.* at 700:1-5).  As part of his evaluation, Dr. Bazos reviewed: (i) Mrs. Pryce's records from South Shore Orthopedic Group; (ii) notes from Mrs. Pryce's surgery; and (iii) Mrs. Pryce's physical therapy notes.  (*Id.* at 700:6-18).  He also reviewed the report of the

---

[25]     Dr. Bazos testified that less than 10% of his practice consists of providing litigation support and evaluation services.  (Tr. 696:24-697:8).  Approximately 90% of his forensic services are on behalf of defense attorney firms.  (*Id.* at 743:14-20).

MRI performed on Mrs. Pryce's right shoulder approximately two weeks after her injury.  (*Id.* at 700:19-22).

Dr. Bazos testified that the MRI report indicated that the MRI did *not* show signs of fresh tearing from recent trauma, despite Mrs. Pryce's claim that she had been injured two weeks prior to the date of the MRI.  (Tr. 702:6-17).[26] He explained that when there is a fresh injury to the shoulder and the patient gets an MRI two weeks later, the MRI should show blood, swelling, and extra fluid.  (*Id.* at 715:5-9).  He testified an acute muscle or tendon tear could be detected in an MRI for weeks to months after the injury.  (*Id.* at 715:9-10).  He explained that there were abnormalities or tears in certain parts of Mrs. Pryce's shoulder, but that such findings were consistent with wear-and-tear changes in an individual over the age of 35.  (*Id.* at 707:12-708:10).[27]

Dr. Bazos also conducted an examination of Mrs. Pryce that showed that she had substantial range of motion in her neck and both shoulders, great strength, and a normal neurovascular structure.  (Tr. 708:21-24, 713:16-22). Based on his evaluation of Mrs. Pryce, Dr. Bazos testified that she likely sprained or strained some of the tissues around her shoulder.  (*Id.* at 714:5-18, 740:17-21, 745:19-23).  More pointedly, Dr. Bazos opined that the labrum and

---

[26]   Dr. Bazos testified that if the MRI films had been provided to him, he would have reviewed them; however, he also explained that he relies on well-written MRI reports in his practice.  (Tr. 704:1-9).

[27]   Dr. Bazos testified about the three types of acromions and explained that someone with a Type 2 acromion would experience more rubbing of the muscle and worse injuries over time.  (Tr. 705:12-706:6).  Indeed, since Mrs. Pryce has a Type 2 acromion, he believed her to be is at increased susceptibility for a rotator cuff tear and impingement syndrome.  (*Id.* at 706:16-707:5).

rotator cuff tears that prompted Mrs. Pryce's arthroscopic surgery were *not* caused by the exercises she performed at the July 2, 2015 training session, but rather were the product of "wear and tear" inherent in aging. (*Id.* at 707:12- 708:10, 714:5-715:12, 716:18-22, 777:2-778:3). He explained that a typical presentation of a rotator cuff tear from acute trauma is immediate, severe pain; an inability to move the arm; difficulty sleeping; swelling; weakness; and a dramatic loss of motion. (*Id.* at 713:2-11).[28] He also testified that nothing in Mrs. Pryce's medical records, nor his examination of her, suggested that the bones, muscles, nerves, ligaments, or tendons in her shoulder were permanently altered by her injury. (*Id.* at 716:8-17).

Dr. Bazos also opined on the diagnoses and treatment protocols that Mrs. Pryce received from her treating medical professionals. He testified that the protocol for treating a soft tissue shoulder injury of this sort is an initial examination, which Dr. Rizzo performed; x-rays, which were also taken; and — given Mrs. Pryce's examination and history — physical therapy for four to six weeks. (Tr. 715:20-24). Dr. Bazos testified that, in his medical opinion, the MRI obtained in this case was premature and did not meet orthopedic protocols, and the surgery, which was performed a month later without conservative care, was not appropriate. (*Id.* at 715:24-716:3).[29]

---

[28] Dr. Bazos testified that one can also sustain a chronic rotator cuff tear that happens over years, but that a chronic tear would cause inconsistent shoulder pain that sometimes fades and sometimes gets worse. (Tr. 713:12-15).

[29] Dr. Bazos also testified that it is part of his practice, and has been the widely accepted practice for over 25 years, to take intraoperative photographs during an arthroscopy. (Tr. 711:15-25). Dr. Bazos said that he was not provided with intraoperative photos of

Finally, Dr. Bazos testified that Mrs. Pryce does not suffer from CRPS, which he described as a debilitating nerve disorder that causes changes in sensation, temperature, hypersensitivity, and hair loss.  (Tr. 720:14-18, 721:24-722:5, 723:2-4).  He explained that CRPS is a severe problem that is usually permanent.  (*Id.* at 725:6-8).  He attributed the burning in Mrs. Pryce's arm instead to a numbing agent that the anesthesiologist would have administered prior to her surgery.  (*Id.* at 720:5-13).  Dr. Bazos observed that he has never seen CRPS from a shoulder arthroscopy, but he has seen, on many occasions, the types of nerve symptoms Mrs. Pryce experienced arise from the anesthesiologist's placement of the nerve block.  (*Id.* at 723:21-724:11).  Dr. Bazos also testified that there is nothing to suggest Mrs. Pryce will need a future surgery based on this incident.  (*Id.* at 720:22-721:4).

### 3.    Dr. Edward Weiland

Finally, the Court accepted Dr. Weiland, a board-certified neurologist, as an expert in the field of neurology.  (Tr. 637:21-24).  Dr. Weiland was retained by NYSC to conduct a neurological evaluation of Mrs. Pryce and was paid $7,500 to testify in court.  (*Id.* at 638:23-639:15).[30]  He conducted a

---

Mrs. Pryce's procedure and there was nothing in Dr. Rizzo's operative report to indicate that intraoperative photos were taken.  (*Id.* at 712:5-9).  He testified that he has never done an arthroscopy without generating intraoperative photos and that it is a breach of standard procedure to fail to take such photos.  (*Id.* at 712:10-25, 727:12-21).

[30]    Dr. Weiland has been testifying as a defense expert since the early to mid-1990s. (Tr. 653:7-9).  He did not dispute that he has testified for the defense more than 200 times, and he testified that he believes that all the medical evaluations he had performed, at least as of 2011, were for the defense.  (*Id.* at 653:10-18, 656:2-6).  In 2012, he conducted 10 to 15 exams per week on behalf of defendants.  (*Id.* at 656:7-12). Approximately half of his practice is dedicated to litigation-related medical exam-type work.  (*Id.* at 673:3-5).

neurological evaluation of Mrs. Pryce on March 15, 2019. (*Id.* at 639:2). Dr. Weiland explained that a neurological evaluation is an "evaluation of the central nervous system, the spinal cord, peripheral nerves that originate from the spinal cord, and the muscle connections that those peripheral nerves make with the muscles to effect bodily function." (*Id.* at 639:17-21).[31]

As part of his evaluation, Dr. Weiland reviewed: "hospital records on the date that the shoulder surgical procedure was performed which was July 29, 2015"; "an evaluation … Dr. Demchuk performed on July 23, 2015"; "follow up orthopedic treatment notes submitted by Dr. Rizzo for services performed on 7/14/15 through 1/26/16"; "an examination before trial report dated 2/8/19"; and "[p]hysical therapy treatment records." (Tr. 646:10-20).

Dr. Weiland testified as follows regarding his neurological examination of Mrs. Pryce:

> The findings regarding the neck area and right arm, there were surgical scars noted in the area of the right shoulder which would have been consistent with an arthroscopic procedure performed at that site, and I indicated there was some minor restriction of range of motion activities of the right shoulder when compared to the left shoulder. The remainder of the neurologic examination regarding both the upper and lower extremity as well as the posterior aspect of the spine was completely within normal limits. I did not find any atypical motor activity. There were no signs of any sensory abnormalities involving the upper extremities. There were no reflex abnormalities. There were no

---

[31] According to Dr. Weiland, the process of conducting a neurological evaluation of a patient includes identifying the reported injury or medical condition, obtaining a patient's history (including treatment rendered before the exam), assessing ancillary medical conditions that may be relevant to the examination, reviewing medical records that have been provided to inform the clinical evaluation, and providing some clinical information. (Tr. 640:3-9).

> functional impairments with the use of upper extremities and specifically the right arm.

(Tr. 647:9-22).  He also testified that there was no clinical evidence to support a finding that Mrs. Pryce had CRPS, nor did he believe Mrs. Pryce had a peripheral nerve injury in her right arm.  (*Id.* at 647:23-648:2, 650:13-16).

## CONCLUSIONS OF LAW

### A.    Applicable Law

#### 1.    Overview of the Relevant Legal Standards

The parties agree that New York law governs Plaintiffs' claims.  (*See generally* Pl. FFCL; Def. FFCL.  The Court therefore begins by addressing the negligence claim brought by Mrs. Pryce, since Mr. Pryce's claim is derivative of hers.  To prevail on her claim, Mrs. Pryce must prove, by a preponderance of the evidence, that: (i) NYSC or Reyes owed her a duty of care; (ii) the duty was breached; and (iii) the breach proximately caused her injuries.  *See Manhattan by Sail, Inc.* v. *Tagle*, 873 F.3d 177, 183 (2d Cir. 2017); *Pasternack* v. *Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016).  In this regard, a preponderance of the evidence requires a showing that something is "more likely than not" true. *United States* v. *Yannai*, 791 F.3d 226, 242 (2d Cir. 2015); *see also* N.Y. Pattern Jury Instr. 1:23 ("The law requires that in order for the plaintiff to prevail on a claim, the evidence that supports [her] claim must appeal to you as more nearly representing what took place than the evidence opposed to [her] claim.").

#### 2.    The Duty of Care and Assumption of Risk

"The threshold question in any negligence action is: does defendant owe a legally cognizable duty of care to plaintiff?"  *Hamilton* v. *Beretta U.S.A. Corp.*,

96 N.Y.2d 222, 232 (2001).  Liability for negligence arises when a defendant owes a plaintiff a duty of care and fails to take reasonable measures to prevent injury arising from conduct that is reasonably foreseeable.  *See Colarusso* v. *Dunne*, 732 N.Y.S.2d 424, 427 (2d Dep't 2001) (citing *Gordon* v. *City of New York*, 70 N.Y.2d 839, 841 (1987); *Kush* v. *City of Buffalo*, 59 N.Y.2d 26, 29-30 (1983)).  However, NYSC argues that it is entitled to judgment in its favor because Mrs. Pryce assumed the risk of injury by voluntarily exercising at the gym.  (*See* Def. FFCL 19-28).

Under New York law, "[t]he doctrine of primary assumption of risk provides that a voluntary participant in a sporting or recreational activity consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation." *DiBenedetto* v. *Town Sports Int'l Inc.*, 987 N.Y.S.2d 102, 103 (2d Dep't 2014) (citing *Morgan* v. *State*, 90 N.Y.2d 471, 484 (1997)).  "The policy underlying the primary assumption of risk doctrine is 'to facilitate free and vigorous participation in athletic activities.'" *Philius* v. *City of New York*, 75 N.Y.S.3d 511, 513 (2d Dep't 2018) (quoting *Benitez* v. *N.Y.C. Bd. of Educ.*, 73 N.Y.2d 650, 657 (1989)).  "The application of the doctrine fosters these socially beneficial activities by shielding coparticipants, activity sponsors or venue owners from potentially crushing liability." *Id.* (internal quotation marks omitted) (quoting *Custodi* v. *Town of Amherst*, 20 N.Y.3d 83, 88 (2012)).

The doctrine is not an absolute defense, but rather a measure of the defendant's duty of care.  *Morgan*, 90 N.Y.2d at 483-84 (citing *Turcotte* v. *Fell*,

28

68 N.Y.2d 432 (1986)).  "[W]hen a plaintiff assumes the risk of participating in a sporting event, the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence[.]"  *Cotty* v. *Town of Southampton*, 880 N.Y.S.2d 656, 659 (2d Dep't 2009) (internal quotation marks omitted) (quoting *Turcotte*, 68 N.Y.2d at 438).  Primary assumption of risk can be a complete bar to recovery.  *See DiBenedetto*, 987 N.Y.S.2d at 104 ("[W]e agree … that the plaintiff assumed the risk of her injuries and was barred from recovery by the doctrine of primary assumption of risk."); *Lamey* v. *Foley*, 594 N.Y.S.2d 490, 494 (4th Dep't 1993) ("Primary assumption of risk eliminates or reduces the tortfeasor's duty of care to the plaintiff and, in the former case, constitutes a complete bar to recovery.").

The assumption of risk doctrine has been extended to cases involving injuries sustained in gyms and fitness centers.  *See, e.g.*, *Marcano* v. *City of New York*, 99 N.Y.2d 548, 549 (2002) (holding that plaintiff assumed the risk of injury when he swung on, and subsequently fell off, an exercise apparatus constructed over a concrete floor); *Ramirez* v. *Lucille Roberts Health Clubs, Inc.*, 973 N.Y.S.2d 572, 573 (2d Dep't 2013) (finding that plaintiff, a participant in step aerobics classes, assumed the risk of injury by voluntarily participating in the class); *Baccari* v. *KCOR, Inc.*, 971 N.Y.S.2d 458, 459 (2d Dep't 2013) (applying assumption of risk to plaintiff, an experienced boxing instructor, who was injured stepping into defendant's boxing ring).

The focus of the inquiry into assumption of risk is the injured party's reasonable expectations and awareness of the risks inherent in the subject activity:

> The applicability of the doctrine depends on the nature and scope of the participant's awareness and consent. As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent[,] or reasonably foreseeable consequences of the participation.   On the other hand, the defendant generally has a duty to exercise reasonable care to protect athletic participants from unassumed, concealed[,] or unreasonably increased risks.   To establish plaintiff's assumption of risk, a defendant must show that plaintiff was aware of the defective or dangerous condition and the resultant risk, although it is not necessary to demonstrate that plaintiff foresaw the exact manner in which his injury occurred. Whether it can be concluded that a plaintiff made an informed estimate of the risks involved in an activity before deciding to participate depends on the openness and obviousness of the risk, plaintiff's background, skill, and experience, plaintiff's own conduct under the circumstances, and the nature of defendant's conduct. Perhaps the most important factor, however, is whether the risk is inherent in the activity.  A plaintiff will not be held to have assumed those risks that are not inherent ... *i.e.*, not "ordinary and necessary" in the sport.

*Lamey*, 594 N.Y.S.2d at 495 (internal quotation marks and citations omitted); *see also Livshitz* v. *U.S. Tennis Nat'l Ass'n*, 761 N.Y.S.2d 825, 828 (N.Y. Civ. Ct. Queens Cty. 2013) ("Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.").

30

Finally, an "important counterweight to an undue interposition of the
assumption of risk doctrine is that participants will not be deemed to have
assumed the risks of reckless or intentional conduct or concealed or
unreasonably increased risks."  *Morgan*, 90 N.Y.2d at 485 (internal citations
omitted).  As one court has noted, the duty of a teacher to use reasonable care
to prevent injury to students "includes the obligation not to direct a student to
do that which is unreasonably dangerous and to provide such instruction and
supervision as is reasonably required to safely perform the directed tasks."
*Yarborough* v. *City Univ. of N.Y.*, 520 N.Y.S.2d 518, 520-21 (N.Y. Ct. Cl. 1987)
(citations omitted).

## B.    Analysis

### 1.    NYSC Is Not Entitled to Judgment on Partial Findings Pursuant to Rule 52(c)

To begin, NYSC seeks a judgment as a matter of law on its assumption of
risk defense pursuant to Federal Rule of Civil Procedure 52(c).  (*See* Def. FFCL
19-25).  On this point, NYSC argues that by signing the membership
agreement, Mrs. Pryce acknowledged that she understood the inherent risks
associated with the use of the NYSC's equipment, and, further, that by
voluntarily using NYSC's equipment and personal training services, she
"assumed the inherent risks associated with participating in a personal
training session in general, and of the specific new exercise in particular."  (*Id.*
at 22).

In support of its argument for judgment as a matter of law, NYSC cites
several New York State cases with ostensibly similar facts, in which courts

have granted summary judgment based on assumption of risk.  (Def. FFCL 21-23).  They include *Pineda* v. *Town Sports Int'l Inc.*, Index No. 113493/2005, 2009 NY Slip. Op. 32582(U), 2009 WL 3780695 (N.Y. Sup. Ct. N.Y. Cty. Nov. 5, 2009), where the court held that a release signed by the plaintiff was enforceable to the extent of insulating Town Sports from liability for "injuries resulting from accidents or injuries of any kind which may be sustained by reason of or in connection with a member's use of the facilities." *Id.* at *3 (citing *Trummer* v. *Niewisch*, 792 N.Y.S.2d 596, 597 (2d Dep't 2005)).  From there, the *Pineda* court found that Town Sports was entitled to judgment as a matter of law because the plaintiff's injuries were not due to any negligence on the gym's part, but rather resulted from the inherent, usual, and ordinary risks associated with weight training.  *Id.* at *5.  NYSC also cites *Blume* v. *Equinox Holdings, Inc.*, No. TS-300345/10, 2013 WL 3814946 (N.Y.C. Civ. Ct. N.Y. Cty. July 17, 2013), where the court rejected the plaintiff's efforts to disclaim assumption of risk because of the involvement of a personal trainer.  In particular, the court held that while the plaintiff had attempted to frame his activity as "exercise under the supervision of a paid expert in a controlled setting," the primary assumption of risk doctrine still applied.  *Id.* at *2; *see also Butt* v. *Equinox 63rd Street, Inc.*, 32 N.Y.S.3d 160, 160 (1st Dep't 2016) (finding defendant gym entitled to judgment as a matter of law where evidence established that plaintiff, an experienced weightlifter, appreciated the risks of the exercise he conducted, and where there was no evidence that the personal

trainer provided inadequate attention as a spotter during plaintiff's bench press).

Unsurprisingly, Plaintiffs respond with several cases in which courts have denied summary judgment on assumption of risk grounds. (Pl. FFCL 28-32). For example, in *Corrigan* v. *Musclemakers Inc.*, 686 N.Y.S.2d 143 (3d Dep't 1999), the Appellate Division upheld the trial court's denial of a motion for summary judgment, finding that the plaintiff had not assumed the risk inherent in using a treadmill. *Id.* at 145. And with respect to the interplay between the assumption of risk doctrine and personal training, Plaintiffs cite *Mellon* v. *Crunch*, No. 7974/09, 2011 WL 2712956 (N.Y. Sup. Ct. Kings Cty. July 8, 2011), where the court denied summary judgment in a case where the plaintiff was injured while doing a plyometric exercise that her trainer had demonstrated for her, preferring instead that the issue go to the jury. *Id.* at *4; *see also Caggiano* v. *LA Fitness & Wellness*, Index No. 600877-15, 2017 N.Y. Misc. LEXIS 5648, at *1 (N.Y. Sup. Ct. Nassau Cty. Apr. 25, 2017) (denying motion for summary judgment in case where plaintiff was injured during an initial evaluation by a personal trainer).

The Court acknowledges that in other factual circumstances, courts have been willing, and less willing, to resolve assumption of risk issues as a matter of law. Here, however, the Court is mindful that "[t]he application of the doctrine of assumption of risk is generally a question of fact to be resolved by a jury." *Layden* v. *Plante*, 957 N.Y.S.2d 458, 461 (3d Dep't 2012). What is more, the Court is loath to resolve the case as a matter of law where it has identified

material factual disputes between the parties, including a dispute as to whether Reyes "unreasonably heightened the risks to which [plaintiff] was exposed' beyond those usually inherent in weight-lifting." *Id.* (quoting *Myers* v. *Friends of Shenendehowa Crew, Inc.*, 819 N.Y.2d 143, 147 (3d Dep't 2006)).   On the one hand, as Defendants argue, Mrs. Pryce exercised with weights voluntarily; she was aware that such exercises carried with them an inherent risk of injury; and while she found the exercise challenging before feeling the pull in her shoulder, she never told Reyes or asked for further instruction on how to do the exercise.  (*See* Def. FFCL 4-6, 22-23).   On the other hand, the Court cannot ignore the fact that Mrs. Pryce was new to weight training and was paying for special instruction from Reyes.   *See Livshitz*, 761 N.Y.S.2d at 830.   Accordingly, the Court will not grant NYSC judgment as a matter of law.

### 2.     NYSC Did Not Breach Its Duty of Care

Unlike the procedural postures of the overwhelming majority of cases cited by the parties, the Court here sits also as trier of fact.  And while the Court has identified factual disputes — material and otherwise — between the parties, it is also charged with resolving those disputes.  In so doing, the Court finds that Mrs. Pryce's negligence action is barred by the assumption of risk doctrine.

To review, under the assumption of risk doctrine, NYSC's duty of care to Mrs. Pryce was "to use due care not to increase the risks to [her] over and above those inherent in the [activity]."  *Livshitz*, 761 N.Y.S.2d at 828.  A plaintiff's consent is the touchstone of the doctrine.  *See, e.g.*, *M.F.* v. *Jericho*

*Union Free Sch. Dist.*, 100 N.Y.S.3d 337, 340 (2d Dep't 2019) (granting summary judgment to defendant because plaintiffs "failed to raise a triable issue of fact regarding whether the defendant's alleged negligent supervision constituted a failure to exercise reasonable care in protecting the plaintiff from an unreasonably increased risk," where plaintiff was "a consenting participant in a qualified activity [and] [was] aware of the risks; ha[d] an appreciation of the nature of the risks; and voluntarily assume[d] the risks"); *Tadmor* v. *N.Y. Jiu Jitsu Inc.*, 970 N.Y.S.2d 777, 779 (1st Dep't 2013) (reversing trial court and granting summary judgment to defendant where plaintiff "had an opportunity to observe [his opponent] before entering the cage" and "demonstrated his appreciation of the risk before sparring"); *cf. Stoughtenger* v. *Hannibal Cent. Sch. Dist.*, 935 N.Y.S.2d 430, 432 (4th Dep't 2011) ("Inasmuch as plaintiff was participating in a compulsory physical education class and his participation in the wrestling unit was mandatory, the defense of primary assumption of risk is not applicable."); *Irish* v. *Deep Hollow Ltd.*, 671 N.Y.S.2d 1024, 1024 (2d Dep't 1998) (reversing the trial court's grant of summary judgment where "there exists a question of fact as to whether the plaintiff assumed the increased risk of riding on a horse at a cantering pace after being told that the horse would only travel at a walking pace").

Even accepting Mrs. Pryce's testimony that Reyes walked approximately 12 feet away from her during her personal training session, the Court finds that Mrs. Pryce has not established facts indicating that she did not freely consent to performing the exercise in question, that Reyes or anyone else at

NYSC concealed any risks associated with the physical training Mrs. Pryce sought, or that Reyes's actions unreasonably increased the risks above the level inherent in the activity to which Mrs. Pryce consented.  Thus, Plaintiffs cannot establish a breach of a duty of care such that NYSC may be held liable for negligence.

*First*, Mrs. Pryce acknowledged, when she signed the membership agreement, that she understood that "[a]ny strenuous athletic or physical activity involves certain risks," and "that there are certain risks associated with the use of a health club and the use of fitness equipment[.]"  (Def. Ex. 3).[32] During trial, she reiterated her agreement that exercise in general, and lifting weights specifically, carries a risk of injury, even when conducted under the supervision of a trainer.  (Tr. 438:14-440:3).  Understanding this risk, she voluntarily joined NYSC, signed up for personal training, and performed the exercises Reyes prescribed for her.  (*Id.* at 440:8-441:2).  Her consent limited the general duty of care owed to her — *i.e.*, NYSC may only be held liable if Reyes, by either action or inaction, concealed, misrepresented, or unreasonably increased the commonly-understood risks to Mrs. Pryce of her use of NYSC's facility and equipment.  *See DiBenedetto*, 987 N.Y.S.2d at 103; *see also Morgan*, 90 N.Y.2d at 485 ("A showing of some negligent act or inaction, referenced to the applicable duty of care owed to him by the defendants, which

---

32      The parties tussle over whether New York General Obligations Law 5-326 bars enforcement of any waiver provision in the membership agreement.  (*Compare* Pl. FFCL 27-28, *with* Def. FFCL 19-20).  The Court need not resolve the dispute, as it relies on the membership agreement as part of its assumption of risk analysis, rather than as a standalone bar to recovery.

may be said to constitute a substantial cause of the events which produced the injury is necessary." (internal quotation marks omitted) (quoting *Benitez*, 73 N.Y.2d at 659)).

*Second*, as Mrs. Pryce herself showed the Court, she performed an exercise, which Reyes had demonstrated for her beforehand, in which she slowly moved an 8-pound medicine ball across the front of her body. Nothing in the record suggests that this was an inherently dangerous exercise, that it was contraindicated specifically for Mrs. Pryce given her known prior injuries, or that Mrs. Pryce expressed concerns about performing it. Mrs. Pryce was not lifting a large amount of weight that she could not control on her own, nor was she using heavy equipment, moving at a fast pace, executing any sort of jerking motion, or performing exercises that would likely exacerbate an underlying condition of which Reyes was aware. *See Layden*, 957 N.Y.S.2d at 461 (finding triable issues of fact as to whether personal trainer's actions unreasonably heightened the risks to which plaintiff was exposed beyond those usually inherent in weight training, where trainer instructed plaintiff to perform an exercise that was contraindicated for a person, like plaintiff, with a herniated disc). The exercise Mrs. Pryce performed in Court was steady and careful and appeared appropriately tailored for a client who was in her third month of personal training. The Court also notes Mrs. Pryce's testimony that, immediately before her injury, she was able to complete two sets of ten repetitions of the exercise on her left side without incident. (Tr. 367:9-20).

*Third*, Mrs. Pryce was unable to demonstrate or explain the mechanism by which she was injured.  Plaintiffs point to Reyes's testimony that if a client is left unsupervised, "the client could get hurt by doing the wrong technique, the wrong form, using the wrong weight[.]"  (Tr. 170:15-18).  Of course, a person could get hurt if she has the wrong technique or uses too much weight, but Plaintiffs have not demonstrated that this proposition applies in this case.  Mrs. Pryce does not contend that Reyes demonstrated how to perform the exercise improperly.  Nor did she seriously argue at trial that the weight was too heavy or that she utilized improper form when performing the exercise.  To the contrary, Mrs. Pryce testified that Reyes demonstrated the exercise to her and observed her performing the exercise on her left side (*id.* at 368:5-12), that she did the exercise as she had been instructed (*id.* at 568:17-19), and that she was able to complete approximately twenty repetitions on her left side successfully (*id.* 367:9-14).

Plaintiffs make much of the fact that Mrs. Pryce testified that she was "struggling" with repetitions of the exercise towards the end of each set, prior to sustaining the injury.  (*See* Pl. FFCL 33, 35).  As Mrs. Pryce clarified, however, when she used the term "struggling," she meant to convey that she was exerting a lot of effort, as is common when exercising.  She did *not* mean that she experienced the sort of pain or discomfort that would indicate the activity was harmful.  Mrs. Pryce always understood that she could stop an exercise if she felt that it was too difficult to complete.  (Tr. 564:4-13).  And at no point did she tell Reyes that she was having any difficulty with the exercise.  (*Id.* at

508:25-509:22).  As far as Mrs. Pryce showed the Court, she properly performed the exercise at all times, including when she felt the pull in her shoulder.

*Finally*, because there is no evidence that Mrs. Pryce had improper form, it is unclear what Reyes could have done to prevent her injury even had he been standing right next to her.  *Cf. Stoughtenger*, 935 N.Y.S.2d at 432 (denying plaintiff judgment as a matter of law on the issue of proximate cause where the record was "devoid of any evidence" that plaintiff's elbow injury was the result of negligence "rather than conduct that could occur even under the most intense supervision in the ordinary course of a … middle school physical education class").  Once Mrs. Pryce advised Reyes of the pull that she felt, he immediately stopped the session and stretched her out.  (Tr. 370:23-371:14). The Court does not overlook Reyes's testimony that, as a general matter, it would be unprofessional and potentially unsafe for a trainer to lose sight of a client while the client was actively performing an exercise (*id.* at 287:25-288:20), and that such conduct might violate NYSC's training policy (*id.* at 289:21-290:11).  Nevertheless, Plaintiffs failed to prove that Reyes permitted, let alone encouraged, Mrs. Pryce to perform the exercise in an unsafe manner. On the facts established at trial regarding the nature of the exercise Mrs. Pryce performed, the Court cannot conclude that Reyes's conduct, even if a deviation from best practices, unreasonably increased Mrs. Pryce's risk of injury.

While Mrs. Pryce does not make the argument explicitly, she is, in essence, relying on the doctrine of *res ipsa loquitor*, which "enables a plaintiff to

prevail in a certain type of circumstance in proving negligence even though the plaintiff cannot show exactly who or what caused her injury." *Manhattan by Sail*, 873 F.3d at 180.  Mrs. Pryce's theory of the case reduces to the proposition that Reyes's walking 12 feet away from her caused her injury.  But the Court may infer negligence under the *res ipsa loquitur* doctrine only where: "[i] the event is of a type that ordinarily would not occur in the absence of negligence; [ii] it is caused by an agency or instrumentality under the exclusive control of the party charged with negligence; and [iii] it is not due to any voluntary action or contribution on the part of injured party.  *Id.*  Plaintiffs failed to introduce testimony or evidence as to these elements at trial.

Nor can Plaintiffs reverse-engineer a finding of negligence through their expert witness, Dr. Hassan.  Dr. Hassan opined that Mrs. Pryce's labral tear was the product of "torque or a sudden force" (Tr. 37:23-38:1), or "abnormal force" (*id.* at 38:2-5).  But, at the risk of repeating itself, the Court watched, repeatedly and with care, as both Reyes and Mrs. Pryce performed the core diagonal crossover exercise in question.  It cannot conclude that the exercise demonstrated for it precipitated the claimed injuries to Mrs. Pryce's shoulder.

For these reasons, the Court concludes that Mrs. Pryce has failed to establish that NYSC breached a duty of care to her by putting her at a greater level of risk than that to which she consented by engaging in physical training with weighted equipment.  Thus, she has not carried her burden of proof on her negligence claim, and NYSC is entitled to judgment on such claim. Further, NYSC is also entitled to judgment on Mr. Pryce's loss of consortium

claim, which is derivative of Mrs. Pryce's negligence claim.  *See Maidman* v. *Stagg*, 441 N.Y.S.2d 711, 713 (2d Dep't 1981).

## CONCLUSION

To be clear, the Court sympathizes with Mrs. Pryce for the pain and discomfort she described at trial, and with both Plaintiffs for the losses (financial and otherwise) to which they testified.  However, on the record before the Court, it cannot lay liability for these losses at the feet of NYSC.  For the reasons explained above, the Court directs the Clerk of Court to enter judgment in favor of NYSC.  The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     March 31, 2021
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge